STATE of Missouri, Respondent,

v.

William Calvin WORSHAM, Appellant.

No. 52350.

Supreme Court of Missouri,
Division No. 2.

July 10, 1967.

Norman H. Anderson, Atty. Gen., Jefferson City, Ben Ely, Jr., Sp. Asst. Atty. Gen., St. Louis, for respondent.

Lawrence O. Willbrand, St. Louis, for appellant.

BARRETT, Commissioner.

William Calvin Worsham, with prior felony convictions, was found guilty of burglary and stealing and the court fixed his punishment at ten years for the burglary and five years for the stealing, the sentences to run concurrently. Specifically the charge was that on September 13, 1965, Worsham broke into a building at West Florissant and Dunn Road belonging to Arthur Enterprises, Inc., operator of 270 Drive-In and stole "one safe and a Red and Yellow Hand Cart." The meritorious and principal claim is that since there was no direct proof that appellant "was present at or near the location of the occurrence in question" his motions for acquittal should have been sustained. Thus the question for determination is whether the fair inferences from the evidence circumstantially support the jury's finding that Worsham broke into the building and stole either of the articles described in the information. Two subsidiary assignments of error are (a) that the court prejudicially erred in commenting to the jury at the close of the evidence that "the power and the responsibility is now yours," and (b) that the court erred in admitting in evidence two documents showing the appellant's prior convictions.

The 270 Drive-In Theatre is located on a thirty-five acre tract of land and about 650 feet from the theatre screen there is a building, also a part of the theatre operation, known as "the club house." This building is occupied and used as the theatre office, storage, cigarette machines, concession equipment, rest rooms and employees' facilities. In the manager's office, "just painted" green, enclosed in concrete was the theatre safe which on September 13 contained $375.00 in change and currency and a $25 check. Three weeks prior to the burglary the manager had purchased from Central Hardware "a little hand truck that was red with pneumatic tires" to carry supplies on. At 2 a.m. September 13, 1965, the manager locked the several doors and secured the premises. About eight o'clock the porter called the manager and he returned to find the door into the utility room pried open and ajar, the lock had been broken as had the door to the office. A filing cabinet had been rifled and there was concrete all over the area from which the safe had been removed. And, the newly purchased handcart was missing.

On the 13th a police officer investigating the burglary found that a tree obstructing a dirt road 175 feet west of the theatre had been moved aside and there was "one path that was matted down" and in the weeds the officers found a welding tank and acetylene torch, complete with gauges, tools and a *pair of canvas gloves*. The welding tank and torch, "a professional cutting outfit," belonged to the appellant Worsham. It had been sold to him on August 26, 1965, for $110.00 by the Woodson Road Welding Company. On September 15, 1965, just back of Worsham's residence, in an open field alongside a Metropolitan Sewer District ditch, the police found the Arthur Enterprises' safe. There were no observable acetylene torch marks but the safe had been opened and in the bottom of it the police found and preserved "a round metal washer." Worsham lived in the Glentown or Ramsey Apartments, 3526 Glentown Apartments. On the evening of the 15th of September the police went to Worsham's apartment, about 8 o'clock, there were at least six people there and one of the women was cooking dinner. After identifying them-

selves the police arrested appellant and secured his permission to search the apartment. In an upstairs bedroom they found a pair of work trousers which Worsham identified as his own. On this trip the police observed a red handcart in the first-floor bathroom. The officers also found and took a "green leather suitcase with various tools," including a metal washer matching the one found in the safe. Both washers "had microscopic flecks of green paint and flecks of white paint on them"—matching the paint in the office and the concrete around the safe. The police took samples and scrapings of green paint from the safe, from a hammer and from the canvas gloves found with the torch. These samples all matched and the debris of "metal turnings or metal shavings" removed from the cuff of Worsham's trousers matched the metal from the drill holes in the safe. The following day the police returned and the handcart was found in the grass and weeds to the rear of his apartment.

Worsham did not testify but his fiancee who lived at 3550 Glentown did and she said that instead of going to, being in and searching his apartment 3526, the police were in and searched her apartment where she was preparing supper for the appellant, his brother and his wife and their children. She said that the acetylene torch which appellant had used in "customizing" his automobile had been stored in the basement to her apartment and one day it disappeared, she "didn't know what had become of it." She said that her five-year old daughter found the handcart in the weeds back of the apartments, the daughter thought "it was a wagon" and "she cleaned it up and left it in her downstairs bathroom." After the police had been there Mrs. Bennett "took it back where my daughter found it because I didn't know where it came from so I put it back out in the field where I had found it."

■ Thus while there were two versions or points of view as to some of these items, Mrs. Bennett's on the one hand and the police on the other, particularly as to the red and yellow "handcart" alleged in the information, the jury could reasonably believe the police version and thereby find that Worsham had possession of the handcart recently stolen from the theatre building. The consequence is that the recent, unexplained possession (of Arthur Enterprises' cart) of the stolen handcart, which is not the only circumstance, is a telling factor upon the charges of both the burglary and the larceny. State v. Kennedy, Mo., 396 S.W.2d 595; 12 C.J.S. Burglary § 59, p. 735; 13 Am.Jur.2d Secs. 53–54, pp. 354–355. The credibility of appellant's or Mrs. Bennett's explanation was a question of fact for the jury "and if the jury disbelieves it the case stands with his possession unexplained." State v. Denison, 352 Mo. 572, 579, 178 S.W.2d 449, 454. But as indicated, possession of the handcart does not stand alone, there are the metal shavings in the cuffs of the trousers, the green paint on the washers, the hammer and the canvas gloves and these circumstances cogently connect him with both the burglary and the larceny. State v. Worley, Mo., 353 S.W.2d 589.

■ The second assignment, without citation of authority, arose in these circumstances: at the conclusion of the arguments the court said, "Well, members of the jury, the power and the responsibility is now yours. You will retire to your jury room to deliberate. You will use these instructions as the law of the case * * *." After the jury retired counsel moved for a mistrial because of the court's statement "concerning the power and authority is now yours." It was said "(o)n the ground that this is placing a suggestion to the jurors as to their responsibility to the community which would encourage them to bring back a verdict of guilty." Counsel said, "well, I am objecting to that term 'responsibility.'" Whatever interpretation one might place on the court's language it was obviously not as counsel contend "more than a comment on the evidence." It may have been a rhetori-

cal or jocular remark (53 Am.Jur. (Trial) Sec. 91, p. 84), or a mere "concededly true general observation." 88 C.J.S. Trial § 49, p. 126. There was no hostility on the part of the court, no expression of opinion upon any issue in the case and in these circumstances and in the absence of compelling demonstration of prejudice it may not be said that the court manifestly infringed the appellant's right to a fair trial.

■ The appellant's third and last point has to do with the evidence establishing his prior felony convictions. It is said that the court erred in admitting into evidence "an instrument purporting to be a certified copy of a court record showing the defendant allegedly had prior felony convictions which instrument *failed to bear a court seal or failed to bear an adequate court seal.*" The second offender law (RSMo 1959, § 556.280, V.A.M.S.) as amended in 1959 provides the procedure and penalty for second offenders but neither that nor any other statute spells out just how the prior offense must be established, the best evidence, of course, is the original record or a duly authenticated copy of the record plus, most important of all, an identification of the accused as the person in both instances, the one on trial and the one previously convicted. State v. Hagerman, Mo., 244 S.W.2d 49, 53–54; State v. King, 365 Mo. 48, 275 S.W.2d 310. And, it may be interpolated, the original or authenticated copies of judgments and records is not the exclusive and only possible method by which prior convictions may be proved or established. While copies of records must be duly authenticated, particularly copies of judgments, there is no requirement that authentication include an official seal, at least as a prerequisite to the validity of the document as evidence (24B C.J.S.Criminal Law § 1967, p. 497; 25 Am. Jur. (Habitual Criminals) Sec. 29, p. 275), as for these purposes, authentication means "verification." 7 C.J.S. p. 1290. This case is not concerned with the authentication of a federal prison record and judgment (State v. Brinkley, 354 Mo. 337, 189 S.W.2d

314, 332–333) and neither is it concerned with the authentication of the records of a sister state (RSMo 1959, § 490.220, V. A.M.S.) nor with records of judicial proceedings involving full faith and credit. RSMo 1959, § 490.130, V.A.M.S.; State v. Young, Mo., 366 S.W.2d 386, 388–389. Here there were two documents, the first is a "Certified transcript of Serial Record" of William Calvin Worsham from the Department of Corrections, that document is signed by the Director of the Division of Classification and assignment and is notarized by a notary public and bears his seal (State v. Tallie, Mo., 380 S.W.2d 425) and its authenticity is not questioned and it shows his prior convictions. Except for the Tallie case all the other cases were concerned with prior records and their proof prior to the 1959 amendment when juries were required to find the prior convictions. The other document is a certified copy of the record of Worsham's prior convictions in the Circuit Court of the City of St. Louis, domestic judgments. They are three in number and are first certified to by James McAteer, Clerk of the Circuit Court of the City of St. Louis, for Criminal Causes. It does not appear that the clerk in his capacity as clerk has a seal; the document concludes "Witness my hand *and the seal of said Court hereto affixed.*" Next, the Honorable Alvin J. McFarland, the then presiding judge of the Circuit Court of the City of St. Louis, certifies that McAteer is the clerk. This record recites that the court "is a Court of Record, *having* a clerk and *seal*" and opposite the judge's signature in parenthesis is the printed word "SEAL," and following that is the clerk's certificate that McFarland is the judge and he attests to the genuineness of the judge's signature. In the technical sense of a device so made that it can "impart an impression in relief" (Webster's International Dictionary) this document does not bear the traditional seal of a common law court but the word "SEAL" in parenthesis is sufficient for a scroll (2 Bouvier's Dictionary, p. 3019) and the document was not inadmissible in evidence for the mere lack

of a traditional mechanical seal impressed upon the document in relief.

For the reasons indicated the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM: The foregoing opinion by Barrett, C., is adopted as the opinion of the court.

All of the Judges concur.